1  R. ALEXANDER SAVERI (SBN 173102)
   CADIO ZIRPOLI (SBN 179108)
2  MELISSA SHAPIRO (SBN 242724)
   SAVERI & SAVERI, INC.
3  706 Sansome Street
   San Francisco, CA 94111
4  Telephone:  (415) 217-6810
   Facsimile:  (415) 217-6813
5  rick@saveri.com
   cadio@saveri.com
6  melissa@saveri.com

7  *Attorneys for Plaintiff and Putative Class*

8  [Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

C 12-1305

| | |
|---|---|
| OTIS ROBERT HARRIS, JR., a.k.a. DAMON HARRIS, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION** |
| v. | **CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT, ETC., FOR MONETARY DAMAGES AND INJUCTIVE RELIEF** |
| UMG RECORDINGS, INC., a Delaware corporation | |
| Defendant. | **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf all those similarly situated, alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiff brings this class action for breach of contract and certain statutory violations under California law against defendant UMG Recordings, Inc., a Delaware corporation with its headquarters in the State of California and having significant business activity in this District, together with its divisions, related and affiliated entities, owned and distributed record labels, and all of its predecessors in interest (collectively, "UMG").

2. This class action is predicated on UMG's failure to properly account for and pay its recording artists and music producers for income it has received, and continues to receive, from the licensees of its recorded music catalog for the sale of digital downloads and ringtones (or "mastertones"). UMG and one of its owned and distributed record labels, Aftermath Records, spent millions of dollars contesting this precise issue in protracted litigation. But the Ninth Circuit Court of Appeals found that UMG failed as a matter of law to properly account for and pay such income to the royalty participants in that case, a decision that the U.S. Supreme Court recently declined to review. See *F.B.T. Productions, Inc. v. Aftermath Records*, 621 F.3d 958 (9th Cir. Sept. 3, 2010), *cert. denied*, 79 U.S.L.W. 3370 (March 21, 2011).

3. Plaintiff here alleges, and the Ninth Circuit found, that digital download and ringtone income received by UMG derives from a license. Holding that UMG's agreements with "iTunes [the marketplace's primary source for legitimate digital downloads of recorded music], cellular phone carriers [like Verizon and AT&T] and other third parties to use its sound recordings to produce and sell permanent downloads and mastertones . . . qualify as licenses" (*id.* at 964), the Ninth Circuit compelled UMG to treat the income derived from those agreements as licensing income and to account to and pay the royalty participants in that case accordingly. By this lawsuit, Plaintiff seeks to compel UMG to account to and pay its other recording artists and music producers (*i.e.*, those not directly involved in the *F.B.T.* litigation) their rightful share of the licensing income paid to UMG for downloads and mastertones of the recorded music licensed by UMG to these entities.

4. Specifically, this action seeks redress for UMG's continuous violation of the terms of its agreements with recording artists and music producers who, like Plaintiff (and the claimants in the *F.B.T.* case), have the contractual right to a sizeable percentage (typically half) of the income UMG receives from the licensing of sound recordings to others to produce and sell permanent downloads and mastertones. In disregard of that right, UMG has adopted a policy and practice of paying or crediting such artists and producers only a fraction of the monies due and owing for the licensing of their music for these uses.

5. UMG has justified its underpayment on the pretext that the agreements between UMG and sellers of downloads and mastertones (such as Apple/iTunes, AT&T and the like) are not licenses, but rather are agreements (sometimes misleadingly referred to by UMG as "resale agreements" and falsely characterized to others in that fashion) indistinguishable from those UMG has with brick-and-mortar stores that sell its CDs and other physical product. Under the agreements between UMG and the members of the Class (defined below), sales of physical product by UMG entitle the recording artists and music producers to a much smaller percentage of the income derived therefrom than does the income derived from a license agreement.

6. The Ninth Circuit rejected the foregoing pretext as a matter of law in the *F.B.T.* case. Nonetheless, UMG has already publicly announced, most recently in an article appearing on March 28, 2011 in the *New York Times*, that the decision by the Ninth Circuit in the *F.B.T.* case "sets no legal precedent"— and that, in substance, it does not intend to alter any of its current policies or practices as they relate to the accounting for and payment of royalties on such income, or to acknowledge past due amounts to their royalty participants for this income. In other words, the rule of law does not apply to UMG.

7. UMG's conduct has substantial monetary consequences for members of the Class. A decent rule of thumb is that for every dollar UMG actually accounts for and pays or credits these artists and producers for digital download and mastertone income, it should be accounting for and paying or crediting anywhere between two and three (or more) dollars. Based upon public reports,

Plaintiff estimates that this difference may amount on a class-wide basis to tens of millions of dollars or more each year.

8. UMG has systematically violated its contractual obligations to Plaintiff and other members of the Class to make proper royalty payments and to properly credit royalty accounts pursuant to agreements between it and its recording artists, music producers and other royalty participants. Moreover, in conjunction with the other conduct alleged below, UMG has done so in a manner that violates California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*

9. As a consequence of UMG's past and continuing contractual and statutory violations, Plaintiff and the other members of the Class have been damaged through the loss of royalties which UMG has retained for its own benefit. Following extended investigation and public hearing, the California State Senate Select Committee on the Entertainment Industry cautioned the major record companies against engaging in policies and practices that constitute "purposeful neglect" of their royalty participants. *See* Note: *California's Recording Industry Accounting Practices Act, SB 1034: New Auditing Rights for Artists*, 20 Berkeley Tech. L.J. 933 (2005). UMG has apparently chosen to ignore this warning.

10. Plaintiff is informed and believes that, before violating its obligations to its royalty participants, UMG vetted the policies and practices at issue in this case at its highest corporate levels; that it commissioned, either on its own initiative or with the support of the U.S. music industry's principal trade organization, so-called "white papers" on the issue; that it analyzed internally the financial consequences of its misconduct and cast it in terms of the additional profit to be made by UMG by avoiding its contractual obligations; that it formulated an opaque and artificial method for accounting for and paying its royalty participants for income derived from such licenses; that it engaged in a sustained public relations effort designed to convince the public that it had employed "groundbreaking" and "enlightened" accounting practices that actually benefitted (rather than cheated) the Class; that it repeatedly made public statements characterizing its agreements with Music Download Providers and Mastertone Providers (as defined below) as resale agreements; and that it sought to enlist those Providers in an effort to re-characterize its

dealings with them to facilitate its conduct toward its artists and producers. In addition, Plaintiff is informed and believes that UMG employed and continues to employ a host of unfair tactics and strategies in its dealings with royalty participants to minimize its exposure from the unlawful conduct at issue here, all of which were also subject to consideration, review and approval by and among the highest placed officers and directors of UMG.

11. Plaintiff seeks compensatory damages on behalf of Plaintiff and the Class, as well as a judgment declaring Plaintiff's and the Class' rights under their agreements to the proper accounting for and payment or crediting of royalties with respect to the income derived from UMG's licensing of its recordings to others to produce and sell digital downloads and mastertones now and in the future.

## II. THE PARTIES

### A. Damon Harris

12. Plaintiff Damon Harris (born Otis Robert Harris, Jr.) is a three-time Grammy Award-winning soul and R&B singer. He is most notable as a member of The Temptations from 1971 to 1975. Harris resides in Owings Mills, Maryland. As a teenager, Harris had formed a Temptations tribute band named The Vandals. The group had charted singles released on T-Neck Records, and later had a few minor hits under the name Impact. With the Temptations, Harris provided lead vocals on hits such as "Superstar (Remember How You Got Where You Are)" (1971), "Take a Look Around" (1972), the no.1 pop hit "Papa Was a Rollin' Stone" (1972, a three-time Grammy Award winner), the no. 1 R&B hit "Masterpiece" (1973), and "Plastic Man" (also 1973). He also sang lead on "Love Woke Me Up This Morning" from the *All Directions* album (1972) and is featured prominently on the hard-to-find album *The Temptations Live in Japan* (1975). Harris is now the founder and CEO of *The Damon Harris Cancer Foundation*, dedicated to promoting the awareness, diagnosis, and treatment of prostate cancer.

### B. UMG

13. UMG claims to be the world's largest recorded music company. According to public reports, it boasts a 30% share in the market for recorded music worldwide. Its labels include,

among others, Interscope Geffen A&M Records (which includes Aftermath Records), Island Def Jam Music Group, and Universal Motown Republic Group. According to its website (www.umusic.com), UMG "discovers, develops, markets and distributes recorded music through a network of subsidiaries, joint ventures *and licensees* in 77 countries, representing 98% of the music market." (Emphasis added.)

### III. JURISDICTION AND VENUE

14. Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1332(d)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) & (c).

### IV. SUBSTANTIVE ALLEGATIONS OF FACT

**A. Music Download Services**

15. In or around 2004, a new and viable method of commercial exploitation of recorded music, music download services ("Music Download Services"), was developed and has since seen widespread implementation in the marketplace. The companies offering Music Download Services include the Apple/iTunes Store (by far the largest in terms of volume and market-share), Amazon.com and Liquid Digital Media (walmart.com), among others (collectively, "Music Download Providers"). It is an adjudicated fact that all of these companies have obtained licenses from UMG authorizing these companies to sell or otherwise distribute, via digital downloads, its catalog of sound recordings.

16. Using Music Download Services, consumers pay a fee to download a copy of a sound recording in the form of a digital audio file (a "Music Download"), copying the file from the Music Download Provider to the consumer's personal computer or other digital storage device. The best known Music Download Provider is Apple's iTunes, which typically charges between $0.99 and $1.29 for a single musical track that the consumer stores on an authorized device such as an iPod. Certain other Music Download Providers operate a subscription service that allows consumers to download musical performances for a set monthly fee, with the ability to play the musical performances contingent on the consumer's continuing payment of the monthly subscription charge. Certain others offer both.

17. With respect to the licensing of Music Download Services, UMG does not manufacture or warehouse any physical product or packaging, nor does it ship or sell any product to stores or other distribution points, and faces no risk of breakage or the return of unsold product. Rather, as the Ninth Circuit held, it is licensing its catalog of recordings to third parties for sale or distribution by them via digital download.

18. The volume and revenue represented by Music Download Services has grown since 2004. The growing percentage of sound recordings sold or distributed by Music Download Services means that UMG's improper accounting significantly understates the royalties owed to Plaintiff and the other Class members.

**B. Mobile Phone Mastertones**

19. Mastertones provide another avenue for the licensing of sound recordings. A mastertone is a portion of a sound recording converted into a digital file that consumers download directly to their mobile phones to customize the sound the phones make when they receive a call, or that a caller hears when placing a call, paying between $1.00 and $3.00 for each mastertone downloaded. The companies offering mastertones include mobile phone companies (AT&T Wireless, Sprint, T-Mobile and Verizon Wireless, among others), content owners (MTV and VH1, among others) and third-party aggregators (Zed, Hudson Soft, Jamster and iTunes, among others) (collectively, "Mastertone Providers"). It is an adjudicated fact that all of these Mastertone Providers have obtained licenses from UMG authorizing these companies to distribute and sell mastertones of the recordings in its catalog of sound recordings.

20. With respect to the licensing of mastertones, UMG does not manufacture or warehouse any physical product or packaging, nor does it ship or sell any product to stores or other distribution points, and faces no risks of breakage or the return of unsold product. Rather, as the Ninth Circuit held, it is licensing its catalog of sound recordings to third parties for sale or distribution by them via digital download.

21. The growing percentage of sound recordings sold or distributed by Mastertone Providers means that UMG's improper accounting significantly understates the royalties owed to Plaintiff and the other class members. According to a recent report by the International Federation for the Phonographic Industry (which can be found at www.ifpi.org), a trade group to which UMG belongs, global digital music sales (which include both varieties of downloads described above) grew to $4.6 billion in 2010. If its reported market share is an accurate measure, then UMG's income from these and other such licenses may have exceeded one billion dollars last year.

### C. The HARRIS-UMG Recording Agreement

22. On or about August 1, 1971, Damon Harris entered into an agreement with Motown Record Corporation ("Motown"). This agreement is referred to herein as the "Harris Agreement." Motown is a subsidiary of The Island Def Jam Music Group, itself a subsidiary of the French-owned Vivendi subsidiary, Universal Music Group ("UMG"). UMG, as Motown's parent company, thus assumes all of Motown's contractual obligations, including the Harris Agreement.

23. The Harris Agreement provides, among other things, that the artist or producer signatory would perform, or cause to be produced, and deliver to Motown certain recordings featuring his performances, as well as the performances of others, and that Motown would manufacture, distribute, sell and license these recordings in various configurations throughout the world.

24. The Harris Agreement governs, among other things, the payment of royalties to Harris for the sale and licensing of the sound recordings delivered by him to Motown. The Harris Agreement provides, with respect to royalties derived from licensing of Harris's master recordings, that:

> 2) Company will pay ... a royalty of six percent (6%) with respect to records sold in the USA based upon 90 % of Company's wholesale price (less all taxes, payments pursuant to collective bargaining, pension and welfare fund or trust agreements and packaging deductions) **except:** (i) as to records sold in the USA by Company's licensees, royalties will be based upon 90% of either such licensee's wholesale price or the average applicable prices at which such licensee sells such records to independent distributors, whichever is lower, provided that if the royalty to Company by Company's licensee is computed on what is commonly referred to as a

retail basis, Company may elect to reduce the rate for royalties payable to me by 50% and compute such royalties on 90% of the applicable retail price....

(3) Company will pay [Harris] a royalty equal to fifteen percent (15%) of Company's net receipts (as shown on statements furnished to Company by its licensees and actually paid by such licensees) with respect to records manufactured and/or sold outside the USA.

25. The Harris Agreement further provides, in connection with the exploitation by Motown of specific rights granted, in addition to any other amount payable hereunder, Motown will pay a royalty of 25% of the moneys received by Company from persons licensed by it to exercise any of the merchandising rights (provided such persons are not subsidiaries or affiliates of the Company) after deducting Motown's out-of-pocket expenses incurred in connection therewith, and 5% of the gross receipts of the Company.

26. The Harris Agreement further provides, among other things, that Motown would (a) provide various financial benefits to its artists and producers, and (b) furnish semi-annual royalty accounting statements setting forth the computation of royalties for the sale or license of recordings, accompanied by any royalty payments due.

27. Under the Harris Agreement, Motown also was obligated to render accurate and complete royalty accounting statements and to properly and accurately account for and credit its artists and producers for royalties generated by the licensing of sound recordings.

### D. The Class-UMG Recording Agreements

28. Upon information and belief, the foregoing provisions of the Harris Agreement are, as relevant to this claim, the same or substantially similar to those found in other Motown production and recording agreements as well as across all or substantially all of UMG's owned and distributed record labels entered into up until approximately April 2004. Those agreements call for accountings and payments to UMG's recording artists and producers for licensing of masters as a percentage (usually 50%) of the receipts of UMG, rather than a lesser percentage as a royalty paid to the artist or producer based on the retail list price of each unit sold.

## V. CLASS ACTION ALLEGATIONS

29. Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on their own behalf and on behalf of:

> All persons and entities (but excluding UMG and any person, trust, firm, corporation or entity affiliated with or related to UMG) who entered into UMG (including its label and affiliates as described above) production or recording agreements from January 1, 1965 to April 30, 2004 and who, along with their agents, successors in interest, assigns, heirs, executors and administrators, received royalties on, or financial credits or adjustments for, income received by UMG from Music Download Services and Mastertone Providers (hereinafter, the "Class") at a rate less than the rate provided for licensing income in their contract with UMG.

30. This action is properly maintainable as a class action.

31. The Class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable. While Plaintiff does not presently know the exact number of class members, Plaintiff is informed and believes that there are hundreds or thousands of class members, and that those class members can be readily determined and identified through UMG's files and, if necessary, appropriate discovery.

32. There are questions of law and fact which are common to class members and which predominate over any questions affecting only individual members of the Class. These common questions include:

(a) Whether UMG violated the agreements to which it was and continues to be bound by, among other things, mischaracterizing licensing income received by it from Music Download Providers and Mastertone Providers in accountings rendered to its royalty participants in violation of those agreements;

(b) Whether UMG benefited financially from its wrongful acts;

(c) Whether UMG continued to collect this licensing income and continued to misreport the royalties due for such income to its recordings artists and music producers despite knowledge of the illegality of said practice;

(d) Whether UMG acted in a manner calculated to conceal the illegality of its actions from its recording artists and music producers;

(e) Whether UMG, by way of the conduct alleged herein, engaged in deceptive or unfair acts or practices in violation of California unfair trade practices laws including, but not limited to, California Business & Professions Code §§ 17200, *et seq.* and §§ 17500, *et seq.*, for which Plaintiff and the other class members are entitled to recover;

(f) Whether Plaintiff and the other class members have been damaged by UMG's actions or conduct; and

(g) Whether, assuming UMG intends to continue to breach its contractual obligations to Plaintiff and the other class members, and/or to violate California state statutory law, declaratory and injunctive relief is appropriate to curtail UMG's conduct as alleged herein.

33. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other class members and Plaintiff has the same interests as the other class members. Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class. Plaintiff is an adequate representative of the class and will fairly and adequately protect the interests of the Class.

34. The prosecution of separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications with respect to individual members of the Class which could establish incompatible standards of conduct for UMG, or adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the members of the Class not parties to the adjudications.

35. Furthermore, as the damages suffered by some of the individual class members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually.

36. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. Class members may be identified from UMG's records and such class members may

be notified of the pendency of this action by mail or by electronic means (like email), using techniques and a form of notice customarily used in class actions.

37. For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## VI. SUBSTANTIVE ALLEGATIONS SUPPORTING A RECOVERY TO PLAINTIFF AND THE CLASS

38. UMG has entered into production and recording agreements with persons or entities in connection with the creation of sound recordings, which entitle those persons or entities to receive a portion of the monies derived from the licensing of such recordings, in the nature of payments, or credits against advances paid by UMG until such advances are recouped, after which royalties are paid.

39. UMG entered into a production or recording agreement with each recording artist or music producer whose musical performances UMG intended to exploit through the licensing of sound recordings of these performances both in the U.S. and abroad.

40. These agreements set forth and govern the calculation, distribution and payment to each class member of their portion of the income derived from the licensing of sound recordings of his or her performances or other creative contribution.

41. Each such agreement contains the same or a substantially similar provision with a formula prescribing the manner in which UMG is required to calculate royalties earned by the music producer or recording artist for sound recordings sold by UMG or its affiliates in the U.S. and around the world; and another different formula prescribing UMG's obligation to account for and pay royalties to the producer or artist for income or receipts from its licensees.

42. Each UMG production or recording agreement sets forth a similar or substantially similar formula for calculating a music producer or recording artist's entitlement to a share of licensing receipts received by or credited to UMG, at a substantially higher percentage than the share paid on receipts from the sale of records by it.

43. It is an adjudicated fact that UMG has licensed all or part of its entire catalogue of sound recordings to Music Download Providers and Mastertone Providers.

44. It is an adjudicated fact that these licenses involve the grant of rights in and to sound recordings so that such Providers can sell or sublicense downloads and mastertones of the recordings in issue to consumers.

45. UMG has failed to comply with the provisions of its recording artist and producer agreements and has accounted for the income derived from the licensing of recordings to Music Download Providers and Mastertone Providers as though UMG were actually manufacturing, distributing and selling records itself. In so doing, UMG takes unjustifiable deductions and applies an incorrect formula for calculating royalties due Plaintiff and the other members of the Class on the income UMG derives from its licenses with Music Download Providers and Mastertone Providers. UMG's accounting practices, as identified above, result in its retention of practically the full amount of receipts from Music Download Services and Ringtone Providers, rather than paying artists the stated percentage of those receipts provided in the pertinent agreements.

46. UMG's inappropriate treatment of income received from Music Download Providers, in violation of the pertinent recording artist and producer agreements, results in Plaintiff and the other members of the Class receiving a fraction of the licensing income to which they are contractually entitled.

47. Similarly, UMG's inappropriate treatment of income received from Mastertone Providers, in violation of the pertinent recording artist and producer agreements, results in Plaintiff and the other members of the Class receiving a fraction of the licensing income to which they are contractually entitled.

48. At all relevant times, UMG had a duty and obligation under the UMG Agreements and its other recording artist and producer agreements to account properly and accurately for income received by it from Music Download Providers and Mastertone Providers to which UMG has licensed the recordings of Plaintiff and the other members of the Class. Rather than fulfill its

contractual obligations, UMG has systematically miscalculated the amounts due and owing to Plaintiff and other class members. In addition, UMG has consistently and publicly maintained that its agreements with Music Download Providers and Mastertone Providers are not licenses. As a result, UMG has under-credited and/or underpaid each and every class member, while deriving substantial unearned financial benefits from licensing class members' recordings to Music Download Providers and Mastertone Providers for digital sale or distribution, and it intends to continue to do so.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

49. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 48, as though fully set forth herein.

50. Plaintiff Harris entered into a recording artist and producer agreement with Motown Record Corporation (a subsidiary of The Island Def Jam Music Group, itself a subsidiary of the French-owned Vivendi, UMG) on or about August 1, 1971.

51. From approximately January 1, 1965 to April 30, 2004, class members commonly entered into recording artist and producer agreements with UMG containing the same or substantially similar terms relating to the treatment of licensing income for accounting purposes, which such income would include, by definition, that income derived from the licensing of recordings to Music Download Providers and Mastertone Providers.

52. Plaintiff and the other class members have performed all, or substantially all, of the obligations imposed on them under their respective recording artist and producer agreements with UMG.

53. By reason of the foregoing, and other acts not presently known to Plaintiff, UMG had materially breached its contractual obligations under the UMG Agreements and the other pertinent recording artist and producer agreements and has disregarded the rights of Plaintiff and the other class members.

54. UMG has failed and refused to cure these breaches and continues to incorrectly calculate these royalties in violation of the UMG Agreements and the other pertinent recording artist and producer agreements and has disregarded the rights of Plaintiff and the other class members.

55. By reason of the foregoing, Plaintiff and the other class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment)

56. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 55, as though fully set forth herein.

57. Plaintiff contends that, pursuant to the pertinent recording artist and producer agreements, UMG is obligated to pay and/or credit Plaintiff and the other class members a certain percentage of the income UMG derives from licensing the sound recordings of Plaintiff and the other class members to Music Download Services and Mastertone Providers, but that UMG has paid them a lower percentage by mischaracterizing these licenses as the sale by it of product.

58. Plaintiff and the other class members have no adequate remedy at law.

59. By reason of the foregoing, there is a present controversy between Plaintiff and the other class members, on the one hand, and UMG, on the other hand, with respect to which a declaratory judgment should be entered determining that the pertinent recording artist and producer agreements obligate UMG to pay and/or credit Plaintiff the percentage specified for licensing, rather than for product sales, when UMG licenses the recordings of Plaintiff and the other members of the Class, to Music Download Services and Mastertone Providers.

## THIRD CAUSE OF ACTION

### (Common Counts – Open Book Account, Code Civ. Proc. § 337a)

60. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 59, as though fully set forth herein.

61. Pursuant to UMG's agreements with Plaintiff and the other class members, UMG keeps, and at all relevant times has kept, open book accounts reflecting the debits and credits made to each class member's account with UMG from inception. Plaintiff is informed and believes that said open book accounts include entries reflecting income UMG has received, and continues to receive, from its licensees for digital download and mastertone uses.

62. These book accounts constitute the principal records of the transactions between UMG and Plaintiff/the other class members, and Plaintiff is informed and believes that said book accounts are, and at all relevant times were, created in the regular course of business of UMG and kept in a reasonably permanent form and manner.

63. UMG has become indebted to Plaintiff and the other class members on said open book accounts in an amount equal to UMG's underpayment on the income UMG has received, and continues to receive, from its licensees for digital download and mastertone uses. The balance outstanding owed by UMG to Plaintiff and the other class members on said open book accounts can be determined by examining all of the debits and credits recorded for each account, including a calculation of the amount of underpayment with respect to digital download and mastertone uses as reflected in the open book accounts.

## FOURTH CAUSE OF ACTION

**(Violations of Unfair Competition Law - California Business & Professions Code § 17200)**

64. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 63, as though fully set forth herein.

65. California Business and Professions Code §§ 17200 prohibits any unlawful, unfair or fraudulent business acts or practices.

66. As detailed in this Complaint, UMG has violated the foregoing law, by engaging in unlawful, unfair and fraudulent business practices. UMG knowingly breached its contracts with Plaintiff and the other members of the Class. UMG either knew, recklessly disregarded, or should have known that its collection of income from Music Download Services and Mastertone Providers was in connection with a license agreement and the royalties payable to Plaintiff and the Class

should have been accounted for and paid on that basis. Furthermore, failing to disclose the unlawful nature of its conduct, and employing such devices as are alleged above, as well as affirmatively representing its authority to collect and account for this income on such basis, had a tendency to mislead recording artists and producers, and the gravity of the misconduct outweighs any possible economic justification for such conduct—of which there is none.

67. The harm to Plaintiff and the class arising from UMG's deceptive and unlawful practices outweighs the utility, if any, of those practices.

68. The conduct described herein is ongoing, continues to this date, and constitutes unfair and fraudulent business acts and practices within the meaning of Business & Professions Code § 17200.

69. Pursuant to California Business & Professions Code § 17203, Plaintiff and the Class are therefore entitled to: (a) an Order requiring UMG to cease the acts of unfair competition alleged herein; (b) an Order enjoining UMG from continuing to account for royalties payable to Plaintiff and the class in the manner it does for income derived from such licenses; (c) full restitution of all monies paid to and retained by UMG otherwise payable to Plaintiff and the class, including, but not limited to, disgorgement pursuant to California Code of Civil Procedure § 384; (d) interest at the highest rate allowable by law; and (e) the payment of Plaintiff's attorneys' fees and costs under, among other provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the other class members, prays for judgment against UMG as follows:

A. Determining that this is a proper class action, and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. On the First Cause of Action, a judgment awarding Plaintiff and the other class members restitution and/or compensatory damages, the exact amount to be proven at a trial of this action, together with interest thereon;

C. On the Second Cause of Action, an order and judgment declaring that UMG's recording agreements obligate UMG to pay and/or credit Plaintiff the percentage specified for licensing, rather than for product sales, when UMG licenses the recordings of Plaintiff and the other members of the Class to Music Download Services and Mastertone Providers;

D. On the Third Cause of Action, a judgment awarding Plaintiff and the other class members compensatory damages in an amount equal to UMG's underpayment on Plaintiff and the other class members' royalty accounts, the exact amount to be proven at a trial of this action, together with interest thereon;

E. On the Fourth Cause of Action, an order and judgment (i) requiring UMG to cease the acts of unfair competition alleged herein; (ii) enjoining UMG from continuing to account for royalties payable to Plaintiff and the class in the manner it does for income derived from licenses with Music Download Providers and Mastertone Providers; and (iii) full restitution of all monies paid to and retained by UMG otherwise payable to Plaintiff and the class, including, but not limited to, disgorgement pursuant to California Code of Civil Procedure § 384, together with interest thereon;

///

///

///

F.  Awarding Plaintiff and the other class members pre- and post-judgment interest, as well as reasonable attorneys' fees, expert fees, costs and expenses, as may be permitted by law; and

G.  Awarding such other and further relief as the Court may deem just and proper.

DATED: March 15, 2012                    SAVERI & SAVERI, INC.

By: _____
R. Alexander Saveri
Saveri & Saveri, Inc.
Cadio Zirpoli
Melissa Shapiro
706 Sansome Street
San Francisco, California  94111-1730
Phone:  415-217-6810
Fax:  415-217-6813

Bryan L. Clobes
bclobes@caffertyfaucher.com
CAFFERTY FAUCHER  LLP
1717 Arch Street, Suite 3610
Philadelphia, PA  19103
Phone:  215-864-2800
Fax:  215-864-2810

*Attorneys for Damon Harris*